**ORIGINAL**

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAR 2 7 2006

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

BP GROUP, INC. and BEN E.      )
PRICE,                          )
                                )
        Plaintiffs,             )      CIVIL ACTION
                                )      FILE NO. _____
v.                              )
                                )      1:06-CV-0707-ODE
GENERAL DYNAMICS CORPORATION )
AND GULFSTREAM AEROSPACE        )
CORPORATION,                    )      Jury Trial Demanded
                                )
        Defendants.             )
_____)

## COMPLAINT

NOW COME Plaintiffs Ben E. Price and B.P. Group, Inc. and file this

Complaint against Defendants General Dynamics Corporation and Gulfstream

Aerospace Corporation as follows:

### Parties, Jurisdiction, and Venue

1.

BP Group is a Florida corporation whose principal place of business is

located in Bradenton, Florida.

2.

Ben E. Price is the principal of BP Group and a Florida resident.

1

3.

Gulfstream is incorporated in both Georgia and Delaware. Gulfstream is registered to do business in Georgia and it may be served at its registered agent, CT Corporation, 1201 Peachtree Street, NE, Atlanta, Georgia 30361.

4.

General Dynamics Corporation is incorporated in Delaware. General Dynamics Corporation is registered to do business in Georgia and it may be served at its registered agent, CT Corporation, 1201 Peachtree Street, NE, Atlanta, Georgia 30361.

5.

This Court has original jurisdiction over the above-styled action under 28 U.S.C. § 1332, because it is a civil action between citizens of Florida and a citizen of Delaware and/or Georgia and the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

6.

This Court has personal jurisdiction over Gulfstream and General Dynamics and, pursuant to 28 USC § 1391, the Northern District of Georgia is the appropriate venue for this action.

2

## Factual Background – The Purchase of the Aircraft

7.

In the spring of 2000, Ben Price, the principal of BP Group, began a search to purchase a new aircraft that would be suitable for his personal and business travel needs, and suitable for use in a charter business.

8.

For his personal and business travel needs, Mr. Price needed an aircraft that could travel safely, economically, and reliably to its intended destinations. Specifically, Mr. Price needed the ability to travel nonstop from the United States to Europe without stopping to refuel the aircraft.

9.

In evaluating specific aircraft for purchase, Mr. Price carefully considered the variable costs he would incur in operating the aircraft, including the cost of fuel, oil, parts, insurance and maintenance (the "Direct Operating Costs").

10.

One of the aircraft that Mr. Price considered purchasing was the Galaxy aircraft (now known as the "G200 Aircraft") and hereinafter referred to as the ("Galaxy/G200"), manufactured by Israel Aircraft Industries Ltd.

3

11.

The Galaxy/G200 Aircraft is a midsized corporate jet with the ability to seat eight to ten individual passengers. Galaxy Aerospace Company, L.P. ("Galaxy") provided completion, marketing and support services for the Galaxy/G200 Aircraft.

12.

On or about May 23, 2000, Mr. C. David Hunt, Regional Sales Manager for Galaxy, made a documentary presentation to Mr. Price over the telephone in which Mr. Hunt, on behalf of Galaxy represented, among other things, that the Galaxy/G200 Aircraft had:

a) A range of 3,620 nautical miles;

b) An $850 per hour Direct Operating Cost (the cost of flying the Galaxy Aircraft including fuel, maintenance, engine and airframe reserves and APU reserves);

c) A Basic Operating Weight of 19,200 lbs; and

d) A private aft lavatory with hot and cold running water for freshening up.

13.

During that May 23, 2000 presentation, Mr. Price expressly advised Mr. Hunt that he was seeking an aircraft that was safe, reliable, economical, and that had the ability to travel to Europe without stopping to refuel.

4

14.

Galaxy's marketing materials regarding the Galaxy/G200 Aircraft, which

Galaxy provided to Mr. Price as part of the May 23, 2000 presentation, stated the

following regarding the range of the Galaxy/G200 Aircraft:

> Just because you want an airplane of the future doesn't mean you have to
> wait years to get it. With its 3,620 n.m. range, the Galaxy opens up a whole
> new class of business airplane, and it's in service today. It's just what we
> said it would be, and more. From the beautiful, spacious cabin, right up to
> the incredibly low hourly operating cost. The Galaxy is here. And available
> for demonstration to all those looking for a plane, not just a plan.
>
> . . .
>
> The Galaxy's 3,620 n.m. range will take you from Central U.S. to Europe –
> Chicago or St. Louis to London – nonstop. And it will take you there for
> considerably less than any other aircraft.

15.

A true and correct copy of Galaxy's marketing materials provided to Mr.

Price prior to the May 23, 2000 meeting are attached hereto as Exhibit A.

16.

Galaxy's marketing materials regarding the Galaxy/G200 Aircraft stated the

following regarding the Direct Operating Costs of the Galaxy Aircraft:

> The Galaxy is much more economical to operate than comparable aircraft.
> In fact, its direct operating cost is less than $850 per hour.

*See* Exhibit A.

5

17.

Additionally, Galaxy's marketing materials provided to Mr. Price as part of the May 23, 2000 presentation stated that the Basic Operating Weight of the Galaxy/G200 Aircraft was "19,200 lb" or "8,709 kg," which included an "8-place interior, typical of avionics options and cabin/galley supplies." *See* Exhibit A.

18.

During the May 23, 2000 presentation, Mr. Price expressly advised Galaxy that it was of primary importance that the Direct Operating Costs ("DOC") for the Galaxy/G200 Aircraft meet the "$850.00 per hour" specifications as set forth during Galaxy's presentation and as represented in Galaxy's marketing materials.

19.

On May 31, 2000, Galaxy made a presentation to Mr. Price in Fort Worth, Texas, in which representatives of Galaxy, including David Hunt (Galaxy Regional Sales Manager), Ted Taveras (Galaxy Marketing Support Specialist), Clint Clouatre (Director of Marketing Services), and Kip Harkness (Director of Design Development) regarding the Galaxy/G200 Aircraft. Galaxy's representatives reaffirmed that the Galaxy Aircraft possessed virtually every one of Mr. Price's most important requirements, including:

a) A range of 3,620 nautical miles;

6

b) An $850 per hour Direct Operating Cost;

c) A Basic Operating Weight of 19,200 lbs;

d) A fuel burn rate of 248 gallons/hour;

e) Reliable, mission capability focus;

f) Well appointed interior tailored to optimize comfort, efficiency and functionality;

g) Timely delivery; and

h) No surprises.

20.

At the May 31, 2000 meeting, Mr. Price again expressly advised Galaxy that he was seeking an aircraft that was safe, economical, reliable, and that had the ability to travel to Europe without stopping to refuel. The marketing materials at this meeting specifically provide, among other things: that the Basic Operating Weight of the Galaxy Aircraft was "19,200" lbs; and that the Galaxy Aircraft had a "performance guarantee" of 3,620 nautical miles. Galaxy's marketing materials include a graphic which demonstrates the supposed intercontinental range capability of the Galaxy Aircraft (3,620 n.m.) from a variety of cities, including Sarasota, Florida. A true and correct copy of Galaxy's marketing materials

7

provided to Mr. Price at the May 31, 2000 meeting are attached hereto as Exhibit
B.

21.

In the presentation on or about May 31, 2000, Galaxy representatives
specifically represented to Mr. Price that the Galaxy Aircraft had an
intercontinental range, and that Mr. Price could use it to fly to Europe from the
United States without stopping to refuel.

22.

In the presentation on or about May 31, 2000, Galaxy representatives
specifically represented to Mr. Price that the Galaxy Aircraft could travel from the
Sarasota Bradenton Airport to the Dublin International Airport nonstop – a
distance of approximately 3,632 nautical miles. Galaxy representatives also
specifically represented to Mr. Price that the Galaxy Aircraft could travel 2,832
nautical miles nonstop from Denver to Hilo, Hawaii in seven hours, thirty-two
minutes, consuming less than 11,600 pounds of fuel. *See, e.g.,* Exhibit B.

23.

While it was marketing and selling the Galaxy Aircraft to Mr. Price, Galaxy
knew that Mr. Price was considering the Galaxy Aircraft in significant part because

8

he could avoid the expense that would be caused by having to stop to refuel on an international flight.

24.

While it was marketing and selling the Galaxy Aircraft to Mr. Price, Galaxy knew that Mr. Price required an aircraft that would be able to provide him, his family, and prospective charter service customers safe and reliable non-stop flight service to international destinations in order to avoid the expense and inconvenience of a fuel stop and the attendant potential for delays and ground mechanical failures.

25.

While it was marketing and selling the Galaxy/G200 Aircraft to Mr. Price, Galaxy knew that Mr. Price needed an aircraft with a range of at least 3,620 nautical miles so that fuel could be used efficiently.

26.

While it was marketing and selling the Galaxy/G200 Aircraft to Mr. Price, Galaxy knew that Mr. Price needed an aircraft with a basic operating weight of no more than 19,200 lbs.

9

27.

While it was marketing and selling the Galaxy/G200 Aircraft to Mr. Price,

Galaxy knew that Mr. Price needed an aircraft with Direct Operating Costs that did

not exceed $850 an hour.

28.

While it was marketing and selling the Galaxy/G200 Aircraft to Mr. Price,

Galaxy knew that Mr. Price was relying upon Galaxy's expertise regarding

midsized corporate jets in the purchase and outfitting of the Galaxy Aircraft.

29.

While it was marketing and selling the Galaxy/G200 Aircraft to Mr. Price,

Galaxy had built and tested at least 15 earlier aircraft and had the exact expert

knowledge from flight testing, development and final completion of other aircraft

that should have prevented it from making promises in the marketing context that

had not been proven or that were already known to be impossible.

## The Purchase Agreement

30.

Galaxy Aircraft incorporated into the Purchase Agreement its specification

and description Revision 5, which reflected an APU change from Allied Signal to

Honeywell and more standard equipment.  Revision 5 indicated that the range of

the Aircraft was 3,620 nautical miles at 34,850 lbs and 19,200 lbs BOW, with four passengers and 15,000 lbs of fuel using NBAA IFR flight plan format under ICAO Standard Atmospheric Conditions (Level, hard surface, dry runway and zero wind). Revision 6, issued on July 1, 2000, continued to emphasize the same weight and range specifications.

31.

Based upon the promises, representations and warranties made by Galaxy, on July 28, 2000, Mr. Price entered into a purchase agreement (hereinafter, "Purchase Agreement") with Galaxy to purchase a Galaxy/G200 Aircraft bearing manufacturer's serial number 016 (the "Galaxy S/N 016 Aircraft").

32.

Galaxy and Mr. Price executed an 'Addendum to Contract for Sale and Purchase, ("Addendum")', contemporaneously with the Purchase Agreement which modified certain terms of the Purchase Agreement. Incorporated as part of the Purchase Agreement were several warranties, including the "Executive Aircraft Limited Warranty."

11

33.

A true and correct copy of the Purchase Agreement and its attachments, including the Addendum, Galaxy Completion Definition, and warranties, is attached hereto as Exhibit C.

34.

Mr. Price chose to purchase the Galaxy S/N 016 Aircraft, rather than other aircraft he had considered purchasing, based upon Galaxy's representations, warranties, and promises regarding the Galaxy S/N 016 Aircraft.

35.

On July 31, 2000, Mr. Price entered into a sale-lease back transaction, whereby he sold the Galaxy S/N 016 Aircraft to a lender, First Union Commercial Corporation, and then leased the Galaxy S/N 016 Aircraft back from First Union Commercial Corporation. A true and correct copy of the Equipment Lease entered into between First Union Commercial Corporation and Mr. Price is attached hereto as Exhibit D.

36.

On September 14, 2000, Mr. Price assigned his interest in the Equipment Lease to BP Group. A true and correct copy of the Assignment Agreement entered into between Ben Price and BP Group is attached hereto as Exhibit E.

12

37.

On March 20, 2003, BP Group contracted with AvBase Flight Services, LLC, an Ohio LLC, for aircraft management services. A true and correct copy of the Amended Aircraft Management Agreement entered into between BP Group and AvBase Flight Services is attached hereto as Exhibit F. As part of that relationship, upon occasion, the Galaxy S/N 016 Aircraft purchased by Mr. Price is used in AvBase's charter flight service business.

38.

Galaxy/Gulfstream delivered the Galaxy S/N 016 Aircraft to Mr. Price pursuant to the Purchase Agreement. The total purchase price paid by Mr. Price for the Galaxy S/N 016 Aircraft was $18,527,250. Mr. Price reasonably believed that this price would pay for an aircraft that was correctly designed, correctly outfitted, would be aesthetically pleasing, and would perform as represented, warranted, and promised by Galaxy.

39.

The Galaxy S/N 016 Aircraft, however, simply does not conform to the specifications and agreements contained in the Purchase Agreement. The non-conformance is material and it includes range, weight, reliability, appearance, safety, and operating cost deficiencies.

13

40.

The Purchase Agreement expressly states and warrants that the Galaxy S/N 016 Aircraft would conform to the Aircraft's specifications. Specifically the Purchase Agreement expressly states and warrants that the Aircraft which was the subject of the Purchase Agreement was the "Galaxy S/N 016 Aircraft as described in the Specification and Description . . . ." (hereinafter, the "Specifications"). *See* Exhibit C.

41.

The Galaxy S/N 016 Aircraft's conformance with the warranties, agreements, and specifications of the Aircraft was an essential part of the negotiated basis of the purchase of the Galaxy S/N 016 Aircraft.

42.

The Specifications for the Galaxy S/N 016 Aircraft provide, among other things, that the Galaxy S/N 016 Aircraft will have:

- A range of 3,620 nautical miles;

- A Basic Operating Weight of 19,200 lbs, inclusive of all optional equipment; and

- An $850 per hour Direct Operating Cost for five years.

14

43.

Regarding the Galaxy S/N 016 Aircraft's range and weight, the

Specifications specifically provide the following:

> Based on the Maximum Takeoff Weight of 34,850 lb/15,808 kg, and a Basic
> Operating Weight of 19,200 lbs 18,709kg, the Galaxy can fly 3,620 nautical
> miles at Mach 0.75 with 4 passengers, 15,000 lb/6,804 kg of fuel using the
> National Business Aviation Association (NBAA) Technical Committee IFR
> flight plan range format.

44.

The Executive Aircraft Limited Warranty, incorporated in the Purchase

Agreement, explicitly warrants the future performance of the aircraft. The

Executive Aircraft Limited Warranty specifically warrants the primary structural

parts of the Galaxy S/N 016 Aircraft against defects in material and workmanship

for a period of ten years after delivery of the Galaxy S/N 016 Aircraft, and limits

parts, accessories and components of the Galaxy S/N 016 Aircraft for a period of

five years. The Executive Aircraft Limited Warranty expressly provides that Mr.

Price would be provided with services of repair and replacement of any defective

parts of the aircraft, pursuant to the terms of the warranty.

45.

In May or June of 2001, General Dynamics Corporation acquired Galaxy, and assumed all operations of Galaxy. Gulfstream, a subsidiary of General Dynamics Corporation, assumed the management responsibility for Galaxy's operations. Together, General Dynamics and Gulfstream (collectively, "Gulfstream") expressly assumed all of Galaxy's responsibilities and obligations under the Purchase Agreement and related Agreements which included responsibility for maintenance pursuant to the Galaxy S/N 016 Aircraft's warranties and the Purchase Agreement's Addendums. After Gulfstream acquired Galaxy, it renamed the Galaxy Aircraft the Gulfstream G200 Aircraft.

## The Galaxy S/N 016 Aircraft's Numerous Defects and Failures

46.

The Galaxy S/N 016 Aircraft has suffered, and continues to suffer from, repeated and numerous defects, deficiencies, and non-conformities. These defects, deficiencies, and non-conformities render it materially non-compliant with the promised warranties and specifications for the Galaxy S/N 016 Aircraft. The Galaxy S/N 016 Aircraft does not and cannot perform as warranted.

47.

The Galaxy S/N 016 Aircraft has been repeatedly grounded or required excessive maintenance and repairs throughout Mr. Price's and BP Group's ownership of the Galaxy S/N 016 Aircraft. The numerous, unresolved design defects and deficiencies with the Galaxy S/N 016 Aircraft have included, but are not limited to the following:

- Failure of the wing components, including the slats and the kreugers;

- Problems with the parking brake;

- Problems with the pitch trim, or turning mechanism;

- No water in the lavatory;

- Leaks in the fuel cell;

- Failure of the Reduced Vertical Separation Minimum (RVSM) Skin Waviness Test;

- Failure of the starter generator;

- Indication of unsafe landing gear;

- Failure of the engine's blow off valves;

- Failure of the left engine's seal;

- Nose wheel steering failure;

- Increased direct operating costs;

- Failure of co-pilot's Primary Flight Display (PFD);

- Failure to meet warranted range;

- Premature failure of the brakes;

- Increased fuel burn rate of 310 gallons/hour; and

- Increased base operating weight.

48.

In each instance, Plaintiffs provided Gulfstream and Galaxy with the required 30 days notice under the Purchase Agreement, Addendum and related agreements regarding the defects and deficiencies listed above. Gulfstream and Galaxy have forced Plaintiffs to argue and fight for the repair and/or replacement of failed items on the Galaxy S/N 016 Aircraft, despite the express representations and warranties provided to Plaintiffs in the Purchase Agreement, Addendum, and related agreements.

49.

The pervasiveness of the defects, deficiencies, and non-conformities in the Galaxy S/N 016 Aircraft have directly impacted the, value, reliability and safety of the Galaxy S/N 016 Aircraft. From the date of the purchase of the Galaxy S/N 016 Aircraft, the Galaxy S/N 016 Aircraft has been out of service for at least 444 of the last 1823 days.

18

50.

Defendants cannot repair or replace any part of the Galaxy S/N 016 Aircraft that will conform the Galaxy S/N 016 Aircraft to the warranties and specifications provided in the Purchase Agreement.

51.

On July 15, 2003, and again on August 22, 2003, July 31, 2004, August 4, 2004, and December 22, 2004, Gulfstream definitively acknowledged that the weight and range promises they had made could not be kept.

52.

The Galaxy S/N 016 Aircraft's actual Basic Operating Weight is 20,900 pounds, whereas the Specifications provided that the Aircraft's Basic Operating Weight would be 19,200 pounds. Bill Boisture, President of Gulfstream was interviewed for Business and Commercial Aviation magazine, an aviation industry periodical, regarding the Galaxy S/N 016 Aircraft. That article noted: "Moreover, the Galaxy was seriously overweight. The 19,200-pound spec BOW was a joke. Most aircraft tipped the scales at 20,000 pounds-plus, all but eliminating the aircraft's highly touted full tanks, four passenger capability." *See*, Fred George, *G200 and G100 – True Gulfstream, Business & Commercial Aviation*, September 2002.

19

53.

While the Purchase Agreement and Executive Aircraft Limited Warranty

purport to limit Gulfstream's liability for breach of warranty and defects to the

repair or replacement of the defective parts of the Galaxy S/N 016 Aircraft,

Gulfstream representatives have confirmed that no repair or replacement of the

defective parts could remedy many of the defects, deficiencies and non-

conformities in the Galaxy S/N 016 Aircraft.

54.

Gulfstream cannot repair or replace any part of the Galaxy S/N 016 Aircraft

that will conform the Galaxy S/N 016 Aircraft to the warranties and specifications

provided in the Purchase Agreement.

55.

Despite repeated promises and undertakings by Galaxy and Gulfstream to

repair or replace Mr. Price's defective Galaxy S/N 016 Aircraft, Mr. Price still has

not received the aircraft he bargained to receive and has not otherwise been made

whole. Gulfstream itself has acknowledged that the Galaxy S/N 016 Aircraft

suffers from serious faults in design, however, Gulfstream continues to refuse to

either replace the Galaxy S/N 016 Aircraft at no additional expense to Mr. Price, or

20

to fully compensate Mr. Price and BP Group for the damages suffered to date as a result of the Galaxy S/N 016 Aircraft's numerous and serious defects.

56.

The numerous and serious defects in the Galaxy S/N 016 Aircraft have resulted in significant damage to BP Group and Mr. Price. Mr. Price has been damaged by paying over $18 million for a defective aircraft. Mr. Price and BP Group have lost numerous charter customers and significant charter revenues because of the repeated failures and groundings of the Galaxy S/N 016 Aircraft. Some of those customers have had to seek alternative charter or commercial flights to ensure they arrive to their destination on time after the Galaxy S/N 016 Aircraft had been grounded. Mr. Price and BP Group have suffered increased costs related to unplanned labor, replacement aircraft and travel expenses, and great embarrassment and loss of reputation for failing to meet charter customers' needs. Mr. Price has suffered damages due to the cancellation or postponement of numerous personal trips and vacations as a result of the Galaxy S/N 016 Aircraft's unreliability. Additionally, Mr. Price will continue to incur damages related to the use of the Aircraft as a result of the increase in direct operating costs of the Aircraft over those promised and warranted by Galaxy and Gulfstream.

21

57.

BP Group and Mr. Price are ready and willing to tender the Galaxy S/N 016

Aircraft to Gulfstream, subject to the stipulation that Defendants compensate

Plaintiffs for any penalties incurred from the lessor as a result of pre-payment of

the lease of the Aircraft.

## **Count I - Breach of Express Warranty**

58.

Plaintiffs incorporate paragraphs 1 through 56 of the Complaint as if fully

set forth herein.

59.

The Purchase Agreement, and Addendum for the Galaxy S/N 016 Aircraft

contain express representations and warranties by Gulfstream, as successor to

Galaxy as follows: "At delivery, the Airplane will conform to the descriptions and

specifications set forth in this Agreement and as described in all exhibits attached

hereto, except for immaterial and insubstantial variations . . . ." *See* Exhibit C.

60.

The Purchase Agreement and Addendum for the Galaxy S/N 016 Aircraft

also state that:

> Acceptance of the Aircraft as evidenced by receipt acknowledging delivery
> shall constitute Purchaser's agreement that the Aircraft conforms to the

22

specifications, standards and other requirements of this Agreement or is otherwise acceptable to the Purchaser **except for latent defects, i.e., those items not reasonably discoverable by Purchaser at the time of inspection**. Any nonconformity of the Aircraft with the specifications or defects (latent or otherwise) discovered after delivery shall be corrected by Seller in accordance with, and as a separate coverage by all of the warranties attached. (emphasis in original).

61.

In the Purchase Agreement and attached Specifications, Galaxy/Gulfstream

expressly warrant and represent, among other things, that the Galaxy S/N 016

Aircraft will have:

- A range of 3,620 nautical miles;

- A Basic Operating Weight of 19,200 lbs, inclusive of all optional

  equipment;

- An $850 per hour Direct Operating Cost for five years;

- A world class interior; and

- Running water in the lavatory.

*See* Purchase Agreement, Exhibit C.

62.

Prior to the purchase of the Galaxy S/N 016 Aircraft, Galaxy/Gulfstream

representatives, as an inducement to Mr. Price, expressly represented and

warranted that, among other things, the Galaxy S/N 016 Aircraft would have:

23

a) a range of 3,620 nautical miles;

b) an $850 per hour Direct Operating Cost;

c) a world class interior; and

d) a Basic Operating Weight of 19,200 lbs.

63.

Additionally, the Executive Aircraft Limited Warranty explicitly warrants the future performance of the aircraft. The Executive Aircraft Limited Warranty specifically warrants the primary structural parts of the Galaxy S/N 016 Aircraft against defects in material and workmanship for a period of ten years after delivery of the Galaxy S/N 016 Aircraft, and limits parts, accessories and components of the Galaxy S/N 016 Aircraft for a period of five years. The Executive Aircraft Limited Warranty expressly provides that Mr. Price would be provided with services of repair and replacement of any defective parts of the aircraft, pursuant to the terms of the warranty.

64.

Gulfstream breached these express representations and warranties and the Purchase Agreement and Addendum by, among other things, providing Plaintiffs with an aircraft that: a) was not reliable; b) did not meet the Specifications; c) could not travel the range warranted in the Specifications; d) did not meet the

24

Basic Operating Weight warranted in the Specifications; e) did not have a world class interior; and f) did not have running water in the lavatory. Gulfstream further breached these express warranties by failing to repair or remedy any of the above described mechanical and design defects.

65.

While the Purchase Agreement and Executive Aircraft Limited Warranty purport to limit Gulfstream's liability to the repair or replacement of the defective parts of the Galaxy S/N 016 Aircraft, Gulfstream representatives have confirmed that no repair, replacement or modification to the Galaxy S/N 016 Aircraft parts would remedy the breaches listed above. Thus, the damages limitations in the Purchase Agreement fail of their essential purpose and Plaintiffs are not limited to asserting claims for repair or replacement of defective parts.

66.

In addition to the purchase price paid for the defective Galaxy S/N 016 Aircraft, these breaches of express warranties directly and proximately caused additional damage to the Plaintiffs, including but not limited to, damage to the Plaintiffs' business reputation and lost profits in an amount to be proven at trial.

25

## Count II - Breach of Services Contract

67.

Plaintiffs incorporate paragraphs 1 through 66 of the Complaint as if fully set forth herein.

68.

The Executive Aircraft Limited Warranty expressly warrants that Gulfstream will make repairs to or replace defective parts of the aircraft. The Executive Aircraft Limited Warranty specifically warrants the primary structural parts of the Galaxy S/N 016 Aircraft against defects in material and workmanship for a period of ten years after delivery of the Galaxy S/N 016 Aircraft, and limits parts, accessories and components of the Galaxy S/N 016 Aircraft for a period of five years. The Executive Aircraft Limited Warranty expressly provides that Mr. Price would be provided with services of repair and replacement of any defective parts of the aircraft, pursuant to the terms of the warranty.

69.

Gulfstream has breached the Executive Aircraft Limited Warranty by failing to provide the services of repairing or replacing the defective parts on the aircraft.

70.

In addition to the purchase price paid for the defective Galaxy S/N 016 Aircraft, these breaches of the Executive Aircraft Limited Warranty directly and proximately caused additional damage to the Plaintiffs, including but not limited to, damage to the Plaintiffs' business reputation and lost profits in an amount to be proven at trial.

## **Count III - Breach of Implied Warranties**

71.

Plaintiffs incorporate paragraphs 1 through 70 of the Complaint as if fully set forth herein.

72.

Galaxy/Gulfstream was fully aware of the purpose for which Mr. Price was purchasing the Galaxy S/N 016 Aircraft – namely, to provide safe, economical, and reliable flight services to his family and charter flight customers.

73.

Galaxy/Gulfstream was fully aware that Plaintiffs required an aircraft with a non-stop range of at least 3,620 nautical miles, an $850 per hour Direct Operating Cost, and an aesthetically pleasing interior.

27

74.

Galaxy/Gulfstream was fully aware that the Plaintiffs were relying upon Galaxy's skill and judgment in selecting a suitable plane for the Plaintiffs' needs.

75.

Galaxy/Gulfstream impliedly warranted that the Galaxy S/N 016 Aircraft sold to Mr. Price was of good and merchantable quality.

76.

Galaxy/Gulfstream impliedly warranted that the Galaxy S/N 016 Aircraft sold to Mr. Price was fit for the particular purpose of providing safe, economical, and reliable flight service for intercontinental travelers.

77.

Gulfstream breached these implied warranties by, among other things, providing Plaintiffs with an aircraft: a) that could not provide safe and reliable charter service; b) did not meet the Specifications; c) could not travel the range warranted in the Specifications; d) did not meet the Basic Operating Weight warranted in the Specifications; e) did not have a world class interior; f) did not have a Direct Operating Cost of $850 an hour; and g) did not have running water in the lavatory. Gulfstream further breached these express warranties by failing to repair or fully remedy any of the above listed mechanical and design defects

28

despite repeated demands by Plaintiffs and repeated unsuccessful attempts to do so by Gulfstream.

78.

While the Purchase Agreement and Executive Aircraft Limited Warranty purports to limit Gulfstream's liability to the repair or replacement of the defective parts of the Galaxy S/N 016 Aircraft, Gulfstream representatives have confirmed that no repair, replacement or modification to the Galaxy S/N 016 Aircraft parts would remedy the breaches listed above. Thus, the damages limitations in the Purchase Agreement fail their essential purpose and Plaintiffs are not limited to asserting claims for repair or replacement of defective parts.

79.

In addition to the purchase price paid for the defective Galaxy S/N 016 Aircraft, these breaches of implied warranties directly and proximately caused additional damage to the Plaintiffs in an amount to be proven at trial.

## **Count IV – Revocation of Acceptance of Contract**

80.

Plaintiffs incorporate paragraphs 1 through 79 of the Complaint as if fully set forth herein.

81.

The Purchase Agreement and its Addendum expressly warrant and

represent: "At delivery, the Airplane will conform to the descriptions and

specifications set forth in this Agreement and as described in all exhibits attached

hereto, except for immaterial and insubstantial variations . . . ." *See* Exhibit C.

82.

The Purchase Agreement and Addendum expressly warrant and represent

that:

> Acceptance of the Aircraft as evidenced by receipt acknowledging delivery
> shall constitute Purchaser's agreement that the Aircraft conforms to the
> specifications, standards and other requirements of this Agreement or is
> otherwise acceptable to the Purchaser **except for latent defects, i.e., those
> items not reasonably discoverable by Purchaser at the time of
> inspection**. Any nonconformity of the Aircraft with the specifications or
> defects (latent or otherwise) discovered after delivery shall be corrected by
> Seller in accordance with, and as a separate coverage by all of the warranties
> attached. (emphasis in original).

83.

In the Purchase Agreement and attached Specifications, Galaxy/Gulfstream

expressly warrant and represent, among other things, that the Galaxy S/N 016

Aircraft will have:

- A range of 3,620 nautical miles;

- A Basic Operating Weight of 19,200 lbs, inclusive of all optional equipment;

- An $850 per hour Direct Operating Cost for five years;

- A world class interior; and

- Running water in the lavatory.

*See* Exhibit C.

84.

Gulfstream breached the Purchase Agreement and related documents by, among other things,  providing Plaintiffs with an aircraft that: a) that could not provide safe and reliable charter service; b) did not meet the Specifications; c) could not travel the range warranted in the Specifications; d) did not meet the Basic Operating Weight warranted in the Specifications; e) did not have a world class interior; f) did not have a Direct Operating Cost of $850 an hour; and g) did not have running water in the lavatory.  Gulfstream further breached the Purchase Agreement by failing to repair or remedy any of the above listed mechanical and design defects.

85.

The Galaxy S/N 016 Aircraft simply and clearly does not and cannot conform to the Purchase Agreement and Specifications.  The non-conformity of

31

the Galaxy S/N 016 substantially impairs the Galaxy S/N 016 Aircraft's value to

the Plaintiffs. Plaintiffs did not discover the range, weight and direct operating

cost non-conformities until after acceptance of the Galaxy S/N 016 Aircraft.

86.

While the Purchase Agreement and Executive Aircraft Limited Warranty

purport to limit Gulfstream's liability to the repair or replacement of the defective

parts of the Galaxy S/N 016 Aircraft, Gulfstream representatives have confirmed

that no repair, replacement or modification to the Galaxy S/N 016 Aircraft parts

would remedy the breaches listed above. Thus, the damages limitations in the

Purchase Agreement fail their essential purpose and Plaintiffs are not limited to

asserting claims for repair or replacement of defective parts.

87.

In addition to the purchase price of the Galaxy S/N 016 Aircraft, these

breaches of contract directly and proximately caused additional damage to the

Plaintiffs in an amount to be proven at trial.

88.

Alternatively, Plaintiffs hereby revoke acceptance of the Galaxy S/N 016

Aircraft based upon the Galaxy S/N 016 Aircraft's non-conformance with the

Specifications and demand the return of the purchase price of the Galaxy S/N 016

32

Aircraft along with damages for delivery of a non-conforming Galaxy S/N 016 Aircraft, including but not limited to any pre-payment penalties for early termination of the lease of the Galaxy S/N 016.

## <u>Count V - Fraud and Negligent Misrepresentation</u>

### 89.

Plaintiffs incorporate paragraphs 1 through 88 of the Complaint as if fully set forth herein, specifically incorporating paragraphs 7 through 34 and paragraphs 37 through 57.

### 90.

Galaxy/Gulfstream made numerous material representations that Galaxy S/N 016 Aircraft would have a range of 3,620 nautical miles and a Basic Operating Weight of 19,200 lbs, inclusive of all optional equipment. Those representations occurred, at a minimum, at the presentations to Mr. Price on or about May 23, 2000, and May 31, 2000, as well as within the Purchase Agreement itself.

### 91.

Galaxy/Gulfstream's material representations regarding the range and weight of the Galaxy S/N 016 Aircraft were false – it does not have a range of 3,620 nautical miles, and does not have a Basic Operating Weight of 19,200 lbs.

33

92.

Galaxy/Gulfstream representatives knew or should have known that the
material representations regarding the range and weight of the Galaxy S/N 016
Aircraft were false. Galaxy/Gulfstream representatives knew or should have
known that the Galaxy S/N 016 could not meet the range of 3,620 nautical miles.

93.

Galaxy/Gulfstream representatives made the representations to Mr. Price
with the intent and purpose of inducing Mr. Price to purchase the Galaxy S/N 016
Aircraft.

94.

Mr. Price relied upon the representations of Galaxy/Gulfstream with regard
to the Galaxy S/N 016 Aircraft's range and weight and did, in fact, purchase the
Galaxy S/N 016 Aircraft based upon those representations.

95.

The Plaintiffs reasonable reliance on Galaxy/Gulfstream's
misrepresentations caused injury to the Plaintiffs in an amount to be proven at trial.

96.

Defendants also made repeated promises and representations that it would
repair Plaintiffs' defective Galaxy S/N 016 Aircraft, despite the fact that they knew

34

no repairs or replacements could remedy the defects, deficiencies and non-
conformities in the Galaxy S/N 016 Aircraft.

97.

Defendants' repeated promises and representations that they would repair
Plaintiffs' defective Galaxy S/N 016 Aircraft delayed Plaintiff from discovering
that the representations that were made to Mr. Price prior to his purchase of the
Galaxy S/N 016 Aircraft were false.

98.

Defendants' fraudulent acts, omissions, or concealments breached a legal
duty, trust, or confidence justly imposed, causing injury and the taking of an undue
and unconscientious advantage, entitling Plaintiffs to actual and punitive damages.

99.

In the alternative Mr. Price seeks rescission of the Purchase Agreement and
related documents.  Mr. Price stands ready and willing to tender the Galaxy S/N
016 Aircraft to Gulfstream, subject to the stipulation that Defendants compensate
Plaintiffs for any penalties incurred from the lessor as a result of pre-payment of
the lease of the Aircraft.

35

## Count V – Attorneys Fees

### 100.

Plaintiffs incorporate paragraphs 1 through 99 of the Complaint as if fully set forth herein.

### 101.

After repeated promises by Galaxy and Gulfstream to repair or replace Plaintiffs' defective Galaxy S/N 016 Aircraft, Plaintiffs still have not been made whole. Gulfstream clearly recognizes that the Galaxy S/N 016 suffers from serious faults in design, however, Gulfstream continues to refuse to either replace the Galaxy S/N 016 Aircraft at no cost to the Plaintiffs, or to fully compensate Plaintiffs for the damage suffered from the Galaxy S/N 016 Aircraft's defects, and Gulfstream's breach of express warranties, breach of contract, and breach of implied warranties.

### 102.

By refusing to compensate Plaintiffs for the damage they have suffered, Gulfstream has acted in bad faith, has been stubbornly litigious and has caused Plaintiffs unnecessary trouble and expense.

103.

Accordingly, Plaintiffs are entitled to recover their attorneys' fees and expenses of litigation incurred in this action. TEX. CODE ANN. § 38.001.

WHEREFORE, Plaintiffs demand a trial by jury on all claims and pray that the Court award it the following relief:

a)    That the Court enter judgment in favor of Plaintiffs against Defendants for compensatory damages in an amount no less than $18,527,250. Alternatively, Plaintiffs pray that this Court rescind or revoke the Purchase Agreement and enter judgment requiring Gulfstream to return the purchase price with damages of the Gulfstream S/N 016 to Plaintiffs;

b)    That the Court enter judgment in favor of Plaintiffs against Defendants for costs;

c)    That the Court enter judgment in favor of Plaintiffs against Defendants for punitive damages;

d)    That the Court enter judgment in favor of Plaintiffs against Defendants for prejudgment interest in an amount to be determined by law;

e)    That the Court enter judgment in favor of Plaintiffs against Defendants for attorneys' fees; and

37

f)      That this Court enter such other and further relief as is just and proper.

Respectfully submitted, this 27th day of March, 2006.

Carl A. Gebo
Georgia Bar No. 288711
John C. Patton
Georgia Bar No. 567232
Jennifer B. Dempsey
Georgia Bar No. 217536
Melissa D. Strickland
Georgia Bar No. 212039
POWELL GOLDSTEIN, LLP
One Atlantic Center
Fourteenth Floor
1201 West Peachtree Street, NW
Atlanta GA 30309
(404) 572-6600

Attorneys for Plaintiffs BP Group, Inc. and
Ben E. Price